UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

EUREKA DIVISION

| | |
|---|---|
| DEREKE G.,[1]<br><br>　　　　Plaintiff,<br><br>　　v.<br><br>MARTIN J. O'MALLEY,<br><br>　　　　Defendant. | Case No. 23-cv-06726-RMI<br><br>**ORDER RESOLVING SOCIAL SECURITY APPEAL**<br><br>Re: Dkt. Nos. 14, 17 |

Plaintiff seeks judicial review of an administrative law judge ("ALJ") decision finding that Plaintiff was not disabled under Title II of the Social Security Act. *See* Admin. Rec. at 1.[2] The Appeals Council of the Social Security Administration declined to review the ALJ's decision. *Id.* As such, the ALJ's decision is a "final decision" of the Commissioner of Social Security, appropriately reviewable by this court. *See* 42 U.S.C. § 405(g), 1383(c)(3). Both parties have consented to the jurisdiction of a magistrate judge (Dkts. 8, 10), and both parties have filed briefs (Dkts. 14, 17). For the reasons stated below, the decision of the ALJ is REVERSED and the case is REMANDED FOR FURTHER PROCEEDINGS consistent with this order.

**I.　　Background**

Plaintiff was 46 years old when he filed his application. AR at 53. He reports that he "came from poverty" and "had a very rough childhood." *Id.* at 580, 612. He was frequently bullied at school. *Id.* at 612. At age 12, he was sexually molested by a stranger in a park. *Id.* The

---

[1] Pursuant to the recommendation of the Committee on Court Administration and Case Management of the Judicial Conference of the United States, Plaintiff's name is partially redacted.

[2] The Administrative Record ("AR"), which is independently paginated, has been filed in eight attachments to Docket Entry #9. *See* Dkts. 9-1 through 9-8.

same year, he was visiting his grandmother when she called him into her room. When he arrived, his grandmother had lapsed into a coma; she passed away shortly afterwards. Plaintiff's parents divorced when he was in high school, and he began staying with friends and on the street because he was unable to stay in the family home at the time. Later in life, he fell victim to abusive relationships, reporting that former partners "maced him, hit him in the head with a pan in his sleep, held him captive, and forced him to have sex." *Id.* In 2009, Plaintiff was shot in the groin by people attempting to burglarize his home. *Id.* at 79, 613. Due to this injury, he cannot have children. *Id.* at 575.

Plaintiff has a history of using and abusing cocaine, alcohol, and marijuana. AR at 576. He reports being jailed four times for drug and alcohol use. *Id.* at 612. By 2018, Plaintiff had had at least two more serious brushes with the law, including an assertedly wrongful conviction for assault with a firearm.[3] *Id.* While jailed for this offense, he witnessed a stabbing; while in prison following his conviction, he witnessed sexual violence. Later, he became involved with the federal justice system. *Id.* The earliest treatment notes in the record reflect that Plaintiff's parole was a source of stress for him. *Id.* at 157, 486, 490, 517. In more recent years, Plaintiff has admirably overcome many of these obstacles. He has not used alcohol or cocaine since 2015, and he keeps a relapse prevention plan taped to his door to help him remain sober. *Id.* at 614. He successfully completed his probation in 2020. *Id.* at 570.

Plaintiff has suffered from depression since he was a child, and he has also been diagnosed with anxiety and post-traumatic stress disorder (PTSD). AR at 492, 496, 651. He consistently reports symptoms such as depressed mood (*id.* at 139, 496, 645, 648, 657), poor sleep (*id.* at 134, 420, 490, 496, 648, 657), low energy (*id.* at 480, 484, 492, 490, 496, 644, 648, 657), poor concentration (*id.* at 413, 424, 496, 649, 657), intrusive thoughts (*id.* at 134, 496, 649, 657), hyperarousal (*id.* at 496, 644, 657), nightmares (*id.* at 486, 488, 490, 496, 648, 657), avoidance (*id.* at 134, 139, 496, 580, 592, 644, 648–49, 657), vigilance (*id.* at 496, 575, 644, 649), worried thoughts (*id.* at 414, 496, 575, 590, 644, 648, 657), difficulty relaxing (*id.* at 496, 644), lack of

---

[3] Plaintiff claims that he has "never touched a gun" and that he was the one assaulted in the charged incident. AR at 612.

initiative (*id.* at 649, 656), and negative self-ideation (*id.* at 139, 496, 649, 657). In 2018, Plaintiff began a medication regimen which "mild[ly]" improved his depression and anxiety in the estimation of his treatment provider. *Compare id.* at 492 ("moderate to severe depression and anxiety" in April 2018) *with id.* at 492 ("moderate depression and anxiety" in June 2018, a "[m]ild improvement"). In 2022, another provider stated that Plaintiff's "anxiety and sadness are severe and interfere with day to day function inclu[ding] social." *Id.* at 141. The same provider found that Plaintiff was "moderate[ly]" impaired in his abilities to perform activities of daily living; maintain social functioning and relationships; concentrate, persist, and maintain pace; and avoid extended episodes of decompensation or increased symptoms. *Id.* at 656. This provider noted that Plaintiff wanted to continue his medications despite the minimal benefit. *Id.* at 134.

In particular, Plaintiff reports that he is anxious about leaving his house. AR at 411 (Plaintiff reports that he "[o]nly goes out to attend" appointments), 414 (Plaintiff "is afraid of . . . a crowd of people. Is afraid of getting shot again."), 496 ("I stay inside, I keep to myself. With everything I have gone through, I'm afraid to go outside."), 580 ("he does not like being around people and wants to stay on his own around the house"), 644 (Plaintiff "tries to stay aw[a]y from the world . . . the apprehension is almost immediate on leaving" the house). Despite this, Plaintiff is able to leave the house frequently to attend appointments, shop, visit friends and family, get haircuts, and go to church. *Id.* at 423, 581, 654. Plaintiff also reports anxiety around authority figures. *Id.* at 414; *but see id.* at 424 (Plaintiff's sister reports that he has not had problems with authority figures since being incarcerated).

Plaintiff alleges that his anxiety and depression make it difficult to concentrate. AR at 414 (claiming a 5-minute attention span and inability to finish what he starts), 424 (Plaintiff's sister reports he can pay attention for "Short Periods of Time" and needs instructions repeated several times), 496 ("poor concentration"), 649 ("Sustained atten[t]ion is poor."); *but see id.* at 135 (treatment provider notes "normal attention" during visit), 140 (same), 480 (provider notes no attention or concentration problems during appointment), 482 (same), 488 (same). Relatedly, he reports issues with his memory. *Id.* at 409 (function report claiming he requires verbal and written reminders to take his medicine), 570 (Plaintiff "has been unable to check his A1C as he forgets to

3

go to the labs prior to visits"); *but see id.* at 497 (Plaintiff denies memory problems). Plaintiff's lack of energy and initiative were noted by one treatment provider as obstacles to completing day-to-day tasks. *Id.* at 656.

In addition to his mental conditions, Plaintiff suffers from several physical ailments. He was diagnosed with diabetes and hypertension in 2018. AR at 538. However, it appears that he has been able to manage these conditions through diet, exercise, and medication. *Id.*, *id.* at 33 (treatment notes from shortly after ALJ's decision state that Plaintiff is feeling well, taking his medication, and "[h]as started exercising two days per week, goes on 1 hours walks. Cut out sugary drinks and fast food. Is cooking meals at home now."), 570 (noting blood sugar tests at goal and regular gym attendance prior to COVID). Plaintiff supplements these efforts with daily marijuana consumption, which "suppress[es] his appetite and thus lower[s] total food consumption and blood sugar[.]" *Id.* at 158. Plaintiff has also stated that his groin injury causes ongoing pain and nerve damage. *Id.* at 611. He reported that this nerve damage meant that he could only walk a single block before needing a ten-minute rest. *Id.* at 413.[4] Plaintiff also told one provider that he had "been hit in [the] head with a metal bar and arm [dis]located with a metal bar[.]" *Id.* at 118. He reported issues with his arm "shut[ting] down like nerve damage[.]" *Id.* at 649. One account of Plaintiff's medical history mentions that Plaintiff was treated in an emergency room for being "hit in the head and shot[,]" but the record before this court contains no documents from that hospitalization. *Id.* at 650.

Plaintiff applied for Social Security benefits on February 6, 2020. AR at 153. His application alleged impairments of PTSD, diabetes, head injury, and hand and nerve damage. *Id.* While his application was pending, Plaintiff was seen by two consulting examiners: Aparna Dixit, PsyD, and Farah Rana, M.D. *Id.* at 575, 580. Dr. Dixit conducted a psychological disability evaluation, while Dr. Rana conducted an internal medicine evaluation. *Id.*

Dr. Dixit reported that Plaintiff was concerned about his safety due to the 2009 shooting. AR at 575. Dr. Dixit also noted that Plaintiff "feels nervous and restless when he is among

---

[4] After the ALJ rendered his decision in this case, Plaintiff was prescribed Gabapentin for this pain. AR at 23.

4

people. He isolates and feels sad and is triggered easily into an anxiety response." *Id.* Dr. Dixit stated that Plaintiff was able to take care of his grooming and hygiene needs and household chores as well as to go grocery shopping and "make himself a simple microwave meal." *Id.* at 576. Plaintiff was noted to spend his leisure time "watch[ing] TV, keep[ing] to himself, socializ[ing] with friends and family, and tak[ing] naps." *Id.* Dr. Dixit observed Plaintiff to be adequately clean and groomed, with an unremarkable gait and adequate eye contact. *Id.* Dr. Dixit described Plaintiff as "cooperative and pleasant" despite a "dysthymic" mood. *Id.* Dr. Dixit also noted no difficulties with attention during the evaluation. *Id.* at 578.

Dr. Dixit performed the WAIS-IV test for IQ, the WMS-IV test for memory, and the Trail Making Test for neuropsychological function. AR at 575. Dr. Dixit assessed Plaintiff's full-scale IQ at 76, "within the borderline impaired range." *Id.* at 577. The WAIS-IV also indicated that Plaintiff's working memory was in the borderline impaired range, while his verbal comprehension, perceptual reasoning, and processing speed were in the low-average range. *Id.* Plaintiff's WMS-IV scores were in the low average range, "suggest[ing] mildly compromised auditory and visual working memory functioning." Plaintiff's Trail Making Test scores "suggested mild impairment in the domain of sequencing, organizing, and mental flexibility and executive functioning." *Id.* Dr. Dixit concluded that "[n]o significant cognitive deficits were evident[,]" although "[p]sychiatric symptoms commensurate with anxiety were noted[.]" *Id.* at 578. Dr. Dixit opined that Plaintiff would have no difficulty remembering or following instructions, working with supervisors or coworkers, or maintaining pace and persistence over two-hour increments. *Id.* Dr. Dixit opined that Plaintiff was mildly impaired in working with the public and performing tasks that require mental flexibility. *Id.*

Dr. Rana noted that Plaintiff "checks his blood sugars very frequently" and "denies any complications of diabetes." AR at 580. Plaintiff also told Dr. Rana that he had been taking his hypertension medication since his diagnosis. *Id.* He complained of "pain and numbness in his left hand" which "bothers him mostly early in the morning and when the weather is cold." He also mentioned his mental health conditions. He told Dr. Rana that "he manages to do most of his chores. He washes dishes, makes up his bed, cleans bathroom, and tidies up after himself. He

5

goes to the store frequently to get himself food and other things." *Id.* at 580–81. Dr. Rana's physical examination was largely normal except for a positive Tinel's sign[5] in Plaintiff's left hand. *Id.* at 581. Despite the Tinel's sign, Plaintiff's left hand had a normal grip and no sensory deficits. *Id.* Dr. Rana observed Plaintiff to have a "stable" gait and no limp. *Id.* Plaintiff's strength was assessed as "5/5 throughout." *Id.* at 582. Dr. Rana concluded that Plaintiff "does not have any sitting, standing, or walking limitations. He does not have any weight-carrying limitations. He can handle, manipulate, feel, and finger objects without any problem. . . . He does not have any postural limitations." *Id.*

Based on this medical evidence, the state agency which initially assessed Plaintiff's Social Security application determined that Plaintiff would be moderately limited in his ability to concentrate, persist, and maintain pace as well as his ability to complete a normal workday or workweek without experiencing psychological symptoms. AR at 175, 180, 182. Plaintiff's physical impairments were found to be non-severe. *Id.* at 161. Plaintiff appealed this determination to the Social Security Administration.

In preparation for the appeal, Plaintiff arranged to be examined by Dr. Katherine Wiebe. AR at 609. Dr. Wiebe described plaintiff as "cooperative and responsive[,]" but noted a "depressed" mood and "restricted" affect. *Id.* at 615. Plaintiff "cried when recalling painful past experiences" and "evinced avoidance and dysphoria when reminded of trauma history." *Id.* Despite "good" effort on testing, Dr. Wiebe noted that Plaintiff was "easily confused[,]" "had trouble with focus and required frequent repetition of directions[,]" and "evinced problem[s] with memory, including immediate and remote memory for his personal history." *Id.* At several points during the assessment, Dr. Wiebe noted that Plaintiff lost his train of thought and turned to unrelated topics. *Id.* at 618 ("He reported that his weight 'fluctuates all the time . . . diabetes now . . . thing with my brother, sitting by the phone . . .'"), 619 ("When asked whether he feels restless, he said he does, adding (incongruously): '. . . I don't like violence and I don't like arguing—that

---

[5] A tingling sensation when an affected nerve is tapped. *Tinel's Sign*, CLEVELAND CLINIC (April 1, 2022), https://my.clevelandclinic.org/health/diagnostics/22662-tinels-sign. It indicates potential damage to, or compression of, the affected nerve. *Id.*

1  what I was getting from my women in my life.'").

2          Dr. Wiebe performed a battery of psychological tests as well as a clinical interview.  AR at
3  615–16.  She determined that Plaintiff had a moderate cognitive impairment, including moderate
4  impairment in attention and concentration and a severe memory impairment.  *Id.* at 616.  Indeed,
5  on one immediate memory test, Plaintiff scored in the $0.2^{nd}$ percentile.  *Id.*  Dr. Wiebe also found a
6  moderate impairment in Plaintiff's language comprehension and moderate to severe impairment in
7  Plaintiff's executive functioning.  *Id.* at 616–17.  She determined that Plaintiff suffered from
8  severe depression and moderate anxiety.  *Id.* at 617.  She noted that Plaintiff was moderately to
9  extremely affected by many symptoms of PTSD.  *Id.* at 617–18.  Plaintiff's responses in the
10 clinical interview "suggest[ed] feelings of extreme vulnerability associated with a current episode
11 of acute turmoil."  *Id.* at 619.  Dr. Wiebe concluded that "[o]n the basis of the test data, it may be
12 assumed that he is experiencing a severe mental disorder."  *Id.*  Specifically, Dr. Wiebe diagnosed
13 Plaintiff with "Major depressive disorder, Recurrent episode, Severe" as well as generalized
14 anxiety disorder, PTSD, an "[u]nspecified neurocognitive disorder," an "[u]nspecified personality
15 disorder" with "Schizoid Personality Traits, Avoidant Personality Traits, Melancholic Personality
16 Features, and Paranoid Personality Features[,]" and a prior history of "[c]ocaine use disorder[.]"
17 *Id.* at 625.

18         In a form appended to her opinion, Dr. Wiebe indicated that Plaintiff was markedly
19 impaired in his abilities to understand, remember, and carry out detailed instructions; maintain
20 attention and concentration for two-hour segments; and complete a normal workday or workweek
21 without interruption from psychologically-based symptoms.  AR at 629.  Dr. Wiebe assessed
22 moderate-to-marked impairments in getting along with others without excessive irritability,
23 sensitivity, argumentativeness, or suspiciousness; interacting appropriately with the general
24 public; accepting instructions and responding appropriately to criticism from supervisors; and
25 responding appropriately to changes in a routine work setting and dealing with normal work
26 stressors.  *Id.*  She assessed moderate impairments in understanding, remembering, and carrying
27 out very short and simple instructions; performing at a consistent pace without an unreasonable
28 number and length of rest periods; and maintaining regular attendance and acceptable punctuality.

1  *Id.*

2        Plaintiff's hearing before the ALJ took place on November 10, 2022. The ALJ called a
3  medical expert as a witness to opine on Plaintiff's psychological impairments. AR at 65. The
4  medical expert was skeptical of Dr. Wiebe's diagnosis of a neurocognitive disorder, stating that
5  such a diagnosis would not be valid until Plaintiff had a "sustained period of remission" from
6  marijuana use. *Id.* at 67. Indeed, the expert said that "many of the diagnoses [were] in doubt or
7  not as reliable as they would normally be without a full sustained period of remission of the
8  cannabis use." *Id.* at 73. He stated that Plaintiff's abysmal performance on Dr. Wiebe's memory
9  assessment was an outlier result which may have been caused by substance use earlier that day.
10 *Id.* at 69. However, he conceded that some of Plaintiff's moderate limitations "would be the case
11 with or without cannabis use." *Id.* at 74. Ultimately, based on his review of the record, he
12 assessed Plaintiff with a moderate limitation in understanding, remembering, and applying
13 information; a mild to moderate limitation in interacting with others; a mild to moderate limitation
14 in concentrating, persisting, and maintaining pace; and a mild limitation in adapting and managing
15 himself. *Id.* at 69.

16       Plaintiff testified about his physical and psychological symptoms. Regarding his physical
17 symptoms, he stated that he had worked on a vehicle assembly line but left the job after two
18 months because he was unable to keep up with the pace of work. AR at 79. He attributed this to
19 "pain from standing" due to his gunshot wound. *Id., id.* at 82. He described both standing and
20 walking as painful. *Id.* at 83–84. He said that sitting was less painful, but that he had to sit in an
21 awkward position which would eventually cause him to cramp up. *Id.* He stated that he had to
22 wear thermal underwear in the cold because the cold worsened the pain, stretch his legs out in
23 front of him to make the pain manageable, and walk carefully to avoid any pain. *Id.* at 85–86.
24 Even with careful walking, he said he needed 30 to 45 minutes of rest after every ten minutes of
25 walking before he could continue. *Id.* at 87–88. Likewise, he reported having to massage his leg
26 for ten minutes after every 15 minutes of sitting. *Id.* at 90. He also described an unhealed elbow
27 fracture which prevented him from extending his right arm. *Id.* at 80–81.

28       Plaintiff also reported suffering from debilitating headaches twice per week. AR at 91. He

United States District Court
Northern District of California

stated that he "can't function" when these headaches occur and that the resulting pain is a 10 out of 10. *Id.*, *id.* at 93. In order to stop these headaches, he reported needing to retreat to a lightless environment and take a sleeping pill. *Id.* at 91–92. He explained that after he woke up, the headache would be reduced to a 2 or 3 out of 10 and could be treated with over-the-counter pain relievers. *Id.* at 92.

Plaintiff discussed his marijuana use, stating that it helps his appetite. AR at 93. He explained that when forced to abstain from marijuana during outpatient treatment, his diet was unhealthy. *Id.* at 94. He also noted that anxious thoughts would keep him awake when he did not take marijuana, stating: "it makes me think a lot more when I don't have the marijuana." *Id.* at 95. Plaintiff stated that his anxiety and depression were both worse when he was not taking marijuana. *Id.* at 96.

Plaintiff described his PTSD as an obstacle to his employment. AR at 80. He stated that his anxiety distracted him from doing chores. *Id.* at 96–97. He noted that he would get distracted after 20 to 30 minutes while washing dishes unless he was listening to music. *Id.* at 97–98. He also alleged that he had to switch tasks every 20 to 30 minutes. *Id.* at 98. He noted that he was often distracted by his thoughts and lost track of time as a result, and that this happened 50 to 60 percent of the time during his daily routine. *Id.* at 103–04.

He described his anxiety around going outside as follows:

> "if I'm outside or around a lot of people, I get a lot of anxiety and I go back into depression because it makes me feel like I'm under a lot of pressure because I'm around a lot of people and I feel like I'm under, like under surveillance or under attack because when I was shot, that was a horrible experience. And then, it just brought up to when I was little when I was sexually molested. So all that just triggers on down to every little bitty thing."

AR at 99.

Plaintiff stated that if he received criticism from a work supervisor, "I would completely shut down and go into like quiet mode because I'm very private." AR at 100. Somewhat incongruously, he continued: "So that right there, my feelings, I've been tortured like just dealing—when I was in relationships with women, when I was living from here to there, the women would call me gay or say bad things about me[.]" *Id.* When prompted, he elaborated that

9

"quiet mode" entailed "just being quiet, mouth closed, head down, wanting to leave, wanting to get a piece [sic] of mind and deal with myself." *Id.* at 101. On further prompting by the ALJ, Plaintiff stated that he would feel the need to leave the area and would have a hard time returning to the job. *Id.*

In a similar vein, Plaintiff testified that he rescheduled and postponed appointments when he didn't feel like leaving the house. AR at 101. He attributed this to "[t]he fear of just going outside and going to deal with regular things of dealing with the doctors and the dentists and things like that. . . . and dealing with court issues, any type of thing that rattle my cage." *Id.* at 102. Plaintiff testified that he cancelled more than half of his appointments. *Id.*

A vocational expert testified that a person who was off task more than 15% of the time would not be employable, nor would an unskilled worker who needed to switch tasks autonomously throughout the workday. AR at 109, 111. The vocational expert noted that walking off the job in response to criticism, especially more than once, would preclude employment. *Id.* at 112.

The ALJ ultimately concluded that Plaintiff was not disabled. AR at 1. The ALJ conducted the required five-step analysis, finding at Step 1 that Plaintiff had not engaged in substantial gainful activity since the application date. *Id.* at 46. At Step 2, the ALJ found that Plaintiff had the severe impairments of depressive disorder, anxiety disorder, PTSD, cannabis use disorder, and polysubstance use disorder in remission. *Id.* The ALJ stated that the personality and neurocognitive disorders diagnosed by Dr. Wiebe were not "medically determinable impairments[,]" as none of Plaintiff's other providers had diagnosed or suspected such disorders, and based on the medical expert's testimony that a diagnosis of neurocognitive disorder could not be reliably made until Plaintiff "had a sustained remission from marijuana use." *Id.* The ALJ further found that Plaintiff's diabetes and hypertension were non-severe because they were not symptomatic. *Id.* at 46–47. The ALJ dismissed Plaintiff's reports of hand and nerve damage, noting Plaintiff's generally normal physical examination and Plaintiff's regular weightlifting. *Id.* at 47. Similarly, the ALJ found Plaintiff's gunshot injury non-severe because the record did not reflect residual symptoms or resulting functional limitations. *Id.* Finally, the ALJ found that

10

Plaintiff's head injury was not a determinable impairment because "the treatment record does not show any head injuries or residual symptoms of a head injury[.]" *Id.*

At Step 3, the ALJ determined that Plaintiff's impairments did not meet or equal a listed impairment. AR at 48. The ALJ considered whether Plaintiff had one "extreme" or two "marked" limitations across the four "Paragraph B" criteria. *Id.* As to the first criterion; understanding, remembering, or applying information; the ALJ determined Plaintiff had a moderate limitation. The ALJ reached this conclusion by noting Plaintiff's onetime denial of memory problems and many normal mental status examination findings relating to memory alongside Dr. Dixit's finding that Plaintiff had a borderline IQ and low-average memory. As to the second criterion, interacting with others, the ALJ found a moderate limitation based on Plaintiff's reported fear of authority figures and crowds, his anxious mood at medical visits, and the fact that medical providers noted no difficulties working with Plaintiff. For the third criterion; concentrating, persisting, and maintaining pace; the ALJ found a moderate limitation based on Plaintiff's self-reported attention difficulties, the treatment notes showing no problems with attention or concentration, and the fact that Plaintiff "displayed no obvious problems with attention or concentration at the hearing. He appeared to follow the proceedings and provided appropriate responses to questions." And for the fourth criterion, adapting or managing oneself, the ALJ assessed a mild limitation based on Plaintiff's evident emotional regulation during medical visits, ability to seek out appropriate medical care and attend his appointments, and ability to perform personal care and household tasks. *Id.*

At Step 4, the ALJ determined that Plaintiff had the residual functional capacity to perform "a full range of work at all exertional levels" but was limited to simple, routine tasks and to occasional interaction with supervisors, coworkers, and the public. AR at 49. The ALJ found that Plaintiff's "determinable impairments could reasonably be expected to cause the alleged symptoms" but that Plaintiff's "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision." *Id.* at 50. The ALJ found these statements "persuasive . . . only to the extent consistent with the residual functional capacity." *Id.*

11

at 52.  The ALJ found the opinions of Dr. Dixit and the state agency's medical consultants partially persuasive, noting that later treatment records "suggest[] some worsening of symptoms relating to [Plaintiff's] depressive and anxiety disorders" since those opinions were issued.  *Id.* at 51.  The ALJ found the medical expert's opinion mostly persuasive but rejected the expert's suggestion that Plaintiff should not do fast-paced work.  *Id.* at 52.  By contrast, the ALJ found Dr. Wiebe's opinion unpersuasive.  *Id.* at 52.  The ALJ stated that Dr. Wiebe's opinion was inconsistent with the "benign mental status findings" and "improvement with medication" reflected in Plaintiff's treatment records, noting that Plaintiff's current mental health provider "believed that the claimant's impairments caused only moderate limitation even before treatment commenced."  *Id.*  The ALJ also found Dr. Wiebe's conclusions inconsistent with Plaintiff's behavior at the hearing, where Plaintiff was "clear and coherent" and "displayed no obvious problems following the proceedings, responding to questioning, or recalling historical information."  *Id.*

Ultimately, based on the vocational expert's testimony, the ALJ concluded that Plaintiff could work as a dishwasher, laboratory equipment cleaner, or machine package sealer.  AR at 54.  Accordingly, the ALJ determined that Plaintiff was not disabled.  *Id.*

Plaintiff appeals.

## II.     Standard

The Social Security Act limits judicial review of the Commissioner's decisions to final decisions made after a hearing.  42 U.S.C. § 405(g).  The Commissioner's findings "as to any fact, if supported by substantial evidence, shall be conclusive."  *Id.*  A district court has limited scope of review and can only set aside a denial of benefits if it is not supported by substantial evidence or if it is based on legal error.  *Flaten v. Sec'y of Health & Human Servs.*, 44 F.3d 1453, 1457 (9th Cir. 1995).  The phrase "substantial evidence" appears throughout administrative law and directs courts in their review of factual findings at the agency level.  *See Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019).  Substantial evidence is defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Id.* at 1154 (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)); *see also Sandgathe v. Chater*, 108 F.3d 978, 979 (9th Cir.

1997). "In determining whether the Commissioner's findings are supported by substantial evidence," a district court must review the administrative record as a whole, considering "both the evidence that supports and the evidence that detracts from the Commissioner's conclusion." *Reddick v. Chater*, 157 F.3d 715, 720 (9th Cir. 1998). The Commissioner's conclusion is upheld where evidence is susceptible to more than one rational interpretation. *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005). However, courts "review only the reasons provided by the ALJ in the disability determination and may not affirm the ALJ on a ground upon which he did not rely." *Garrison v. Colvin*, 759 F.3d 995, 1010 (9th Cir. 2014).

### III. Analysis

The court concludes that the ALJ failed to analyze Plaintiff's testimony in sufficient detail to allow for adequate review. "A finding that a claimant's testimony is not credible must be sufficiently specific to allow a reviewing court to conclude the adjudicator rejected the claimant's testimony on permissible grounds and did not arbitrarily discredit a claimant's testimony regarding" subjective symptoms. *Brown-Hunter v. Colvin*, 806 F.3d 487, 493 (9th Cir. 2015). "The ALJ must specify what testimony is not credible and identify the evidence that undermines the claimant's complaints—general findings are insufficient." *Burch*, 400 F.3d at 680 (internal quotations and alterations omitted).

To be sure, the ALJ made the necessary showing to discredit some parts of Plaintiff's testimony. For example, the ALJ properly discounted Plaintiff's physical symptom testimony: "Reports of significantly diminished walking capacity and inability to extend the right arm are inconsistent [with] the physical examinations throughout the record, which show no clinical abnormalities in the extremities, as well as the claimant's demonstrated ability to lift weights, use a Stairmaster, and use a treadmill on a regular basis." AR at 52–53.[6] For other alleged symptoms, however, the court has been left to guess which testimony is being disregarded and why. Most notably, Plaintiff testified that he would likely respond to criticism from a supervisor by leaving the premises, and the vocational expert testified that this would preclude competitive work. The

---

[6] Plaintiff does not allege any errors relating to the ALJ's discrediting of his physical symptoms.

ALJ implicitly discredited this testimony by finding that Plaintiff was employable, but the ALJ's opinion contains no explanation as to why this specific testimony was discredited. Additionally, Plaintiff testified that he suffers debilitating headaches twice per week that require him to retreat to a lightless environment and take a sleeping pill. While this would certainly seem to bear on Plaintiff's employability, the closest the ALJ's opinion comes to addressing this testimony is noting at Step 2 that "the treatment record does not show any head injuries or residual symptoms of a head injury[.]" *Id.* at 47. To the extent this is meant to discredit Plaintiff's headache testimony, it is both insufficiently specific (as recurring headaches might be caused by conditions other than a head injury) and contradicted by the ALJ's later statement that Plaintiff's "medically determinable impairments can reasonably be expected to cause the alleged symptoms[.]" *Id.* at 50.

The ALJ's failure to specifically analyze Plaintiff's allegations has affected multiple steps of the analysis. At Step 2, for instance, Plaintiff's testimony about his cognitive and emotional symptoms could bolster Dr. Wiebe's diagnoses of personality and neurocognitive disorders, leading to a determination that these were serious impairments. At Step 3, Plaintiff's testimony about his symptoms bears on the listing analysis: for example, Plaintiff claims that he cancels most of his appointments due to anxiety, but the ALJ determined that Plaintiff was minimally limited in adapting and managing himself because (among other things) he could attend medical appointments. Further, Plaintiff's testimony corroborates his self-reports in the treatment notes, content which the ALJ generally disregarded. And at Step 5, as previously mentioned, one of Plaintiff's alleged symptoms would preclude employment based on the evidence in the record. Accordingly, the court cannot say that the failure to properly analyze Plaintiff's testimony was harmless error. Remand is therefore required.

**IV.     Form of Remand**

Plaintiff requests that his case be remanded for an award of benefits instead of for further proceedings. After careful review of the record, however, the court has determined that further proceedings are appropriate in this matter. Remand for further proceedings is appropriate when "an evaluation of the record as a whole creates serious doubt that a claimant is, in fact, disabled." *Garrison*, 759 F.3d at 1021. In the past, the Ninth Circuit has allowed for remand where, although

14

an ALJ failed to make the necessary findings to discredit a plaintiff's testimony, the record cast doubt on the plaintiff's credibility. *See, e.g., Burrell v. Colvin,* 775 F.3d 1133, 1141 (9th Cir. 2014), *Connett v. Barnhart*, 340 F.3d 871, 876 (9th Cir. 2003).

Here, the record contains potential contradictions which may indicate that Plaintiff exaggerated some of his symptoms. *Compare* AR at 409 (Plaintiff's function report states he "[p]repare[s] simple meals or does frozen dinners. Or does not eat" despite being able to cook more complex meals before his disability) with *id.* at 421 (third-party function report states Plaintiff cooks daily for up to an hour, prepares dishes like steak and pasta, and has not changed his cooking habits since becoming disabled); *id.* at 82 (Plaintiff testified that he was let go from an assembly-line job because he moved too slowly on account of his significant pain) *with id.* at 613 (Plaintiff told a doctor that he was actually dismissed from that position in retaliation for joining a lawsuit); *id.* at 411 (Plaintiff's function report states he only leaves the house to attend appointments and his family shops for him) *with id.* at 422 (third-party function report states Plaintiff leaves the house daily, shops once per month, and likes to visit two different stores when shopping), 23 (three years after the function reports were issued, treatment notes indicate Plaintiff "[l]ikes to shop daily" and dines out several times per week); *id.* at 102 (Plaintiff testified that he cancels over half of his appointments due to anxiety) *with id.* at 14–543 (medical records from Plaintiff's primary care provider indicate only two cancelled appointments out of 13 appointments total, roughly half of which were in-person).

These apparent contradictions do not necessarily mean that Plaintiff is not credible, and in context some may prove not to be contradictory at all. Nevertheless, "[b]ecause there are insufficient findings as to whether [Plaintiff's] testimony should be credited as true, [the court will] remand for further determinations." *Connett*, 340 F.3d at 876.

**V.  Instructions on Remand**

While the ALJ's failure to make sufficiently specific credibility findings is sufficient to require remand, Plaintiff has raised other issues with the ALJ's decision which the court addresses below.

      *a.  Step 2 Error – Wiebe Diagnoses*

15

Plaintiff argues that the ALJ improperly discounted his diagnoses of personality and neurocognitive disorders based on the medical expert's testimony. The medical expert testified that it was not possible to reliably diagnose personality or neurocognitive disorders without a sustained period of remission from marijuana use. As Plaintiff points out, Social Security Ruling (SSR) 13-2p prescribes a process whereby the ALJ first determines whether a claimant is disabled, then accounts for the effect of drug addiction and alcoholism ("DAA") on Plaintiff's symptoms. The Social Security Administration has stated that "[a] claimant has DAA when he or she has a medically determinable substance use disorder(s)[.]" SSA POMS DI 90070.050 (2021). As Plaintiff sees it, the ALJ should have analyzed Plaintiff's personality and neurocognitive disorders when determining whether Plaintiff was disabled, and then considered whether those disorders were caused or exacerbated by Plaintiff's marijuana use.

Defendant argues that SSR 13-2p does not apply to Plaintiff because "the ALJ did not find Plaintiff had a medically determinable impairment of DAA and that Plaintiff was disabled[.]" (Dkt. 17, p. 3). However, Defendant is wrong on the first count: the ALJ listed "cannabis use disorder" as among Plaintiff's "severe impairments," then described the listed impairments as "medically determinable" in the next paragraph. AR at 46. On remand, the ALJ should reevaluate Plaintiff's asserted neurocognitive and personality disorders as they are reflected in the record, then account for the effect of Plaintiff's cannabis use disorder on the severity or existence of these disorders if Plaintiff is determined to be disabled.

  b. *Use of ALJ's Observations*

Plaintiff also takes issue with the fact that the ALJ relied in part on his observations of Plaintiff at the hearing to determine that Plaintiff could pay attention for long periods of time. However, an ALJ may properly take into account his observations of the plaintiff when determining credibility as long as those observations do "not form the sole basis for discrediting a person's testimony." *Orn v. Astrue,* 495 F.3d 625, 640 (9th Cir. 2007); *see Morgan v. Comm. of Soc. Sec. Admin.*, 169 F.3d 595, 600 (9th Cir. 1999) ("The inclusion of the ALJ's personal observations does not render the decision improper.") (internal citations and quotations omitted).

For the foregoing reasons, this matter is remanded for further proceedings consistent with

this order.

**IT IS SO ORDERED.**

Dated: March 17, 2025

_____
ROBERT M. ILLMAN
United States Magistrate Judge

17